IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RYAN SWINK, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO: _____ |
| | § | |
| UBER TECHNOLOGIES, INC. | § | |
| AND TRAVIS KALANICK, | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Ryan Swink, on behalf of himself and those similarly situated, by and through his counsel of record, Bruse Loyd and Kathleen A. O'Connor of Jones Gillaspia & Loyd, LLP, brings this action against Defendants Uber Technologies, Inc. ("Uber") and its Chief Executive Officer and co-founder, Travis Kalanick ("Kalanick"), alleging as follows:

## INTRODUCTION

1.      This is an antitrust action against Uber and Kalanick.  Defendants developed a simple business model that has allowed them to prosper.  The premise of Uber's service is increased options, flexibility, and value for consumers fueled by true competition among Uber drivers.  However, the reality is Defendants concocted a plan to fix prices among Uber drivers and then take a percentage of these fares paid by Plaintiff and other Uber passengers similarly situated.  The price-fixing app requires Uber passengers to pay more for transportation than they would in a truly competitive situation.  The plan works for Defendants but is unlawful.  The price-fixing scheme violates the United States' and Texas' antitrust law.  This lawsuit seeks injunctive and monetary relief on behalf of Uber riders injured by Defendants actions.

2.      Defendants' plan, from its origin, was to fix prices in a particular market.  Defendants contend Uber is not a transportation company and that it does not employ drivers.  Instead, Defendants tout Uber as a technology based company providing an app for riders to use on their cell phones. The app is designed to link drivers with passengers. The app generates a fare based on a formula created by Defendants and controlled by

1

Defendants.  The app generated price is charged by all Uber drivers through a payment system within the app. The Uber driver does not have any say in the price charged and must accept the app generated fare if they want to continue to be an Uber driver/partner. The fares change at times, and sometimes vary wildly, but whatever price is produced by the app is the price charged by the Uber driver. The ultimate outcome is Defendants take a cut of those fixed, and usually inflated, fares generating revenues for themselves through a price-fixing scheme prohibited by law.

3.     Uber drivers are, to a great extent, aware of Defendants' price-fixing.  In 2014, Defendants conspired with different levels of Uber drivers to create a spike in fares that would allow them all to make more money, at the expense of Uber passengers.  This agreement illustrates Defendants' involvement in fixing prices among competing drivers.

4.     Uber is not a transportation company that employs drivers and uses its technology to compete against like companies.  It circumvents the traditional transportation company model, and all expenses and complications that come with it, and tries to have it both ways:  Uber contends that it allows its drivers to work independently, but Uber tells them what price to use and can manipulate that price to their satisfaction and benefit, and to the detriment of consumers like Plaintiff and others similarly situated.  According to Uber, their drivers are independent contractors competing with each other for riders. If that is true, they should be competing on price as do drivers using other ride-share platforms. Instead, they have joined Defendants in their scheme to fix prices among direct competitors.  Defendants' price fixing is classic anticompetitive behavior.

6.     Defendants conduct violates Section I of the Sherman Act, 15 U.S.C. § I, and Section 15.01 *et. seq.*, of the Texas Business and Commerce Code, also known as the Texas Fair Enterprise & Antitrust Act of 1983. In this action, Plaintiffs seek injunctive relief preventing Defendants from continuing their conspiracy and money damages to all Uber riders injured by their actions.

**PARTIES**

6.      Plaintiff Ryan Swink is a resident of Houston, Harris County, Texas.  Plaintiff has used Uber car services on multiple occasions in Harris County, Texas and has paid higher fares as a result of Defendants' unlawful acts.

7.      Uber Technologies, Inc. is a Delaware Corporation who conducts business in the State of Texas. Its Registered Agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

8.      Defendant Travis Kalanick is a resident of California and the CEO of Uber.  He may be served with service of process at Uber's corporate headquarters located at 1455 Market Street, FL 4, San Francisco, CA 94103-1355, or wherever he may be found.

**JURISDICTION AND VENUE**

9.      The Court has subject matter jurisdiction over this case pursuant to IS U.S.C. §§ 4 and 15 and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the United States of America's antitrust laws.  The Court has supplemental jurisdiction of the pendant state law claims pursuant to 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over Defendants as they conduct business within the State of Texas and have regularly and systematically transacted and/or solicited business in this State, either directly or through intermediaries, have derived substantial revenue for services rendered in Texas, have purposely availed themselves of the benefits of the State of Texas and committed wrongful acts in whole or in part within the State of Texas, which have had direct effects in this State.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claims occurred in this district.

**FACTS**

**What is Uber?**

12.     Uber is an on-demand car service that seeks to match riders with drivers.   It is Uber's position, in other litigation and elsewhere, that it is not a transportation company and does not provide transportation services itself. Instead, Uber offers an application for smartphone devices (the "Uber App") through which users of the Uber App can request private drivers to pick them up and take them to their desired location. The Uber App utilizes dispatch software to send the nearest registered driver to the requesting party's location.

13.     Following completion of a ride, Uber calculates a fare based on a base amount, ride distance, and time spent in transit, which may be multiplied during "surge" periods if rider demand is high and/or driver supply is low, and then processes a transaction on behalf of the driver.   Uber then collects a percentage of the fare as a software licensing fee and remits the remainder to the driver-partner.

14.     Uber users like Plaintiff, and others similarly situated, provide their name, mobile number, email, language, and credit card numbers or PayPal account information to Uber in exchange for an Uber account and access to the Uber App. To become an Uber account holder, an individual first must agree to Uber's terms and conditions and privacy policy.

15.     Uber account holders can obtain a "Fare Quote" directly from the Uber App by entering their pickup location and destination. The Uber App calculates the approximate amount based on the expected time and distance.   A rider pays a driver a fare in a transaction facilitated by Uber, but to which Uber is not a party. Uber facilitates payment of that fare by charging the user's credit card or Pay Pal billing information on file and purportedly serves as the drivers' "limited payment collection agent" in this regard. Uber then sends a receipt to the user's email address.

**The Uber Driver**

4

16.     Uber actively recruits drivers to serve as "partners."   Uber and its drivers "expressly agree that no joint venture, partnership, employment or agency relationship exists between [the driver and] Uber."  When Defendants decide to offer Uber App services in a new geographic location, they use social media to advertise for new "partner" drivers and holds meetings with these potential drivers.   At these meetings, Uber tells potential drivers they have "the freedom to get behind the wheel when it makes sense for you" and "you choose when you drive, where you go, and who you pick up." Drivers have discretion as to whether to transport riders and may decline or cancel a request if, for example, a rider is unruly or intoxicated.  As of November 2014, Uber had an estimated 8,000 driver-partners operating in Houston, Texas alone.

**Defendants Control the Pricing**

41.     Uber has steadfastly maintained that the driver-partners are not employees of Uber, not part of any Uber joint venture, and are wholly independent. In exchange for being listed on the Uber App, the drivers agree to pay a percentage of the fare to Uber.  The fares are calculated based on an Uber-generated algorithm. As demand for car services increases among users, applying the Uber algorithm results in increased fares or "surge pricing."  Defendants' surge pricing model allows for up to eight times the standard fare to be charged during periods of high demand. Defendants, with the drivers conspiring with them, have employed surge pricing on a regular basis.

Uber has not publicly revealed the specifics of its pricing algorithm.  Upon information and belief, Defendant Kalanick conceived of and implemented the "surge pricing" model into the Uber algorithm to artificially manipulate supply and demand by imposing surge pricing on drivers who would otherwise compete against one another on price.  Kalanick and Uber control the fares charged to riders. Through the pricing algorithm and its surge pricing component, Kalanick and Uber artificially set the fares for its driver-partners to charge to riders.

51.     Although they are independent partners, the drivers are not controlling the fare. Uber uses "surge pricing" to incentivize its driver-partners to use the Uber App during periods of peak demand. Uber provides alerts to its driver-partners relating to "surge pricing" based on demand or limited availability of drivers.

53.     Uber also communicates with its driver-partners to inform them of what their increased earnings might have been had they logged into the Uber App during recent busy periods. Uber also provides its driver-partners with information regarding upcoming events that are likely to create high-demand for transportation services (e.g., concerts, sporting events, busy holidays).

54.     Uber manipulates its pricing algorithm by, among other things, encouraging drivers who are not available or willing to receive trip requests to log out of the Uber App in order to show less supply (which equates to higher fares).

55.     Defendant Kalanick has stated "you want supply to always be full, and you use price to basically either bring more supply on or get more supply off, or get more demand in the system or get some demand out. It's classic Econ 101."  Kalanick has further explained the power of his surge pricing model by revealing that "when demand outstrips supply, the price comes up in a particular neighborhood or across a city."  With the power of this app, Defendants and their conspiring drivers reap artificially high profits during peak demand periods like New Year's Eve, Houston Livestock and Rodeo, and major sporting events.

**The Drivers Involvement in Price Fixing**

60.     All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm. Uber purports to allow its driver-partners to depart downward from the fare set by the Uber algorithm. In reality, however, drivers cannot do so. The drivers collect fares through the Uber App, rather than through a direct transaction with the rider. Accordingly, Uber controls the fare. The driver-partners agree to adhere to it because the artificial rates set by the pricing algorithm are higher on

average than the fares that Plaintiff and Class Members would otherwise be charged in a competitive marketplace.

72.     Kalanick, in his position as Uber CEO, has orchestrated collusion among driver-partners to raise fares. Upon information and belief, Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares. By organizing this price-fixing conspiracy, Kalanick ensured that fares would rise to a level that Uber, and the Texas drivers *(i.e.,* direct competitors), had jointly agreed upon. As a result, riders using the Uber App have suffered by paying for increased fares resulting from this price-fixing conspiracy. The driver-partners had a common motive to conspire to adhere to the Uber pricing algorithm and the resulting artificially high fares because they could yield supra-competitive prices through their collective action.

**Plaintiff and the Putative Class Suffered Antitrust Injury**

80.     But for Defendants and Uber drivers' conspiracy to fix fares charged by drivers using the Uber App, Uber ride-share service fares would have been substantially lower, including during the implementation of surge pricing. Absent these anticompetitive actions, riders would have been able to obtain rates resulting from fare competition among drivers.  Defendants' imposition of surge pricing is not to perfectly match supply with demand as purported, but instead to remove some demand so that prices stay artificially high and Defendants and drivers reap artificially high profits.

82.     Upon information and belief, Kalanick's Uber ride-share service comprises approximately 80 percent of the mobile app-generated ride-share service market. As a result of Kalanick's anticompetitive actions, competition in the market for mobile app-generated ride-share service, and the sub-market of Uber car service, has been restrained.

**Statewide Class**

84.     Plaintiff sues on behalf of himself and a class of persons pursuant to Federal Rule of Civil Procedure 23. The Class consists of all persons in the State of Texas who, on one or more occasions, have used

the Uber App to obtain a ride from an Uber driver-partner and paid a fare for that ride set by the Uber pricing algorithm. Excluded from the Class are Defendants, their co-conspirators, their employees, officers, directors, and legal representatives and heirs.

85.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each Class member can be identified by using Defendant's records and/or the records of Uber. Plaintiff is informed and believes that there are many thousands of Class members.

86.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether Kalanick and the Uber driver-partner co-conspirators unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section I of the Sherman Act by agreeing to charge all Uber riders the fare calculated by the Uber algorithm;

b. Whether Kalanick's actions in orchestrating the Uber pricing conspiracy violated Section 15.01 *et. seq.*, of the Texas Business and Commerce Code also known as the Texas Free Enterprise and Antitrust Act of 1983;

c. Whether consumers and Class members have been damaged by Kalanick's conduct;

d. Whether punitive damages are appropriate;

e. Whether Kalanick should disgorge unlawful profits;

f. The amount of any damages; and

g. The nature and scope of injunctive relief necessary to restore a competitive market.

87.     Plaintiff's claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

88.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained as Class Counsel able class action litigators.

89.     Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual Class

member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant. Separate actions by individual Class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of Class members to pursue their claims. A class action also makes sense because Defendant has acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
### (Violation of the Sherman Act, 15 U.S.C. § 1)

90.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

91.     Plaintiff does not believe it is necessary to prove a relevant market. To the extent one is required the relevant product market is mobile app-generated ride-share service, with a relevant sub-market of Uber car service.

92.     To the extent required, the relevant geographical market is the State of Texas.

93.     Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Specifically, Kalanick coordinated an unlawful agreement among the Uber driver-partners to adhere to the Uber pricing algorithm (including its Surge Pricing component) for fares charged to Uber riders.

94.     This unlawful arrangement consists of a series of vertical agreements between Kalanick and each of the Uber driver-partners, as well as a horizontal agreement among the Uber driver-partners to adhere to the Uber pricing algorithm.

95.     Were it not for their understanding that the other driver-partners were agreeing to the same thing, some driver-partners would not have entered the vertical agreements with Kalanick and Uber.

96.     Through Kalanick's and Uber's actions, the Uber driver-partners have been enabled to participate in a horizontal agreement amongst themselves to adhere to the artificial price setting embodied in the Uber pricing algorithm. Defendant and Uber have sought to obscure the unlawful nature of this

arrangement by disingenuously claiming that Uber driver-partners can charge a lower fare than the one generated by the Uber algorithm. At the same time, Defendant and Uber tout the ability for Uber driver-partners to earn more money by adhering to the Uber algorithm, and they facilitate Uber driver-partners' opportunities to meet together.

97.     In orchestrating the horizontal price-fixing conspiracy, Kalanick committed himself to achieving an unlawful objective: namely, collusion with and among the co-conspirator drivers to set prices.

98.     Despite Kalanick's position as a vertical market participant, his organizing of the conspiracy subjects him to per se liability for the results of the horizontal price-fixing agreement just as much as if operated at the same level as the driver-partners.

99.     In addition, Kalanick's role as an occasional Uber driver puts him in a horizontal relationship with his driver-partner peers, which further supports per se treatment of his arrangements in restraint of trade.

100.     Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

101.     Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

102.     The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained. Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### SECOND CAUSE OF ACTION
### (Violation of the Texas Free Enterprise and Antitrust Act of 1983)

103.     Plaintiff repeats and re-alleges all previous allegations as if set forth in full herein.

104.     Through unlawful contracts, agreements, arrangements or combinations, Defendant has restrained trade in violation of Section 15.01 *et. seq*., of the Texas Business and Commerce Code also known as the Texas Free Enterprise and Antitrust Act of 1983.

10

105.    For the same reasons that Kalanick is liable for a Sherman Act violation for orchestrating an unlawful price fixing agreement among the Uber driver-partners, so too is he liable under the Texas Free Enterprise and Antitrust Act of 1983.

106.    In addition, Kalanick's conduct in requiring Uber driver-partners to adhere to the Uber pricing algorithm, subjects him to liability under the Texas Free Enterprise and Antitrust Act of 1983 on the alternative grounds that his actions constitute an unlawful vertical agreement in restraint of trade. Such vertical price-fixing is unlawful *per se*.

107. Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

108.    Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

109. The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained. Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY DEMAND

110. Plaintiff requests a jury trial of all issues triable of right to a jury.

**WHEREFORE,** Plaintiff demands judgment against Kalanick as follows:

Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel.

A declaration that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct or damage inflicted by any other co-conspirator;

A declaration that the use of the pricing algorithm for setting fares as described above is unlawful;

An award of monetary damages in an amount to be proved at trial, plus interest, to Plaintiff and Class members;

Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

Pre-judgment and post-judgment interest on such monetary relief;

Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

The costs of bringing this suit, including reasonable attorneys' fees, as further provided under the statutes cited herein; and

All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

Dated: April 22, 2016

Respectfully submitted,

JONES, GILLASPIA & LOYD, L.L.P.

/s/ John "Bruse" Loyd
John Bruster Loyd
State Bar No. 24009032
SDTX No. 23240
Kathleen A. O'Connor
State Bar No. 00793468
SDTX No. 63644
4400 Post Oak Pkwy, Suite 2360
Houston, Texas 77027
Telephone: 713.225.9000
Facsimile: 713.225.6126
bruse@jgl-law.com

ATTORNEYS FOR PLAINTIFF